[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 16-5377**

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATHAN MICHAEL SMITH,

Appellant,

v.

DONALD J. TRUMP,

Appellee.

On Appeal from the
United States District Court
for the District of Columbia
1:16-cv-00843 (CKK)

## BRIEF OF APPELLANT

DAVID H. REMES
Appeal for Justice
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508
remesdh@gmail.com

*Counsel for Appellant*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

*Parties*. The parties who appeared before the District Court were Appellant, Army Captain Nathan Smith; Appellee, Barack H. Obama; and The Constitution Project, *amicus curiae*, in support of Appellant.

*Ruling under review*. This is an appeal from a ruling by District Judge Colleen Kollar-Kotelly, filed November 21, 2016. (App. 63.) There is no official citation. The judgment disposes of all parties' claims.

*Related cases*. There are no related cases.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

GLOSSARY OF ABBREVIATIONS .......... ix

JURISDICTION .......... 1

ISSUES PRESENTED FOR REVIEW .......... 1

STATEMENT OF THE CASE .......... 1

STANDARD OF REVIEW .......... 6

SUMMARY OF ARGUMENT .......... 6

ARGUMENT .......... 8

I. CAPTAIN SMITH SUFFERS INJURY IN FACT BECAUSE HE MUST CHOOSE BETWEEN TWO POTENTIAL HARMS. .......... 8

A. The Officers' Oath Compels Captain Smith To Choose Between Two Potential Harms. .......... 8

B. *Little* Requires Officers to Disobey the President's Orders When They Exceed His Powers as Commander-In-Chief .......... 13

C. Captain Smith Has Standing Under The Oath-Taker Cases. .......... 19

II. THIS CASE DOES NOT RAISE A "POLITICAL QUESTION." .......... 22

A. The District Court Ignored *Youngstown* in Determining Whether The Case Raises Issues "Completely Committed To The Political Branches." .......... 24

B. This Case Does Not Involve "Factual Questions" Which The Judiciary Is Poorly "Equipped To Resolve." ..... 28

C. The 2001 and 2002 AUMFs Do Not Authorize "Hostilities" Against ISIL. ..... 31

D. The District Court Erred In Giving Authoritative Status To Stephen Preston's Speech Justifying the War ..... 39

E. Congressional Funding of OIR Does Not Constitute the "Specific" Authorization Required by the WPR. ..... 44

CONCLUSION ..... 52

CERTIFICATE OF COMPLIANCE ..... 53

CERTIFICATE OF SERVICE ..... 54

# TABLE OF AUTHORITIES

## CASES

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ....................6

*Baker v. Carr*,
369 U.S. 186 (1962) ....................20, 24

*Bender v. Williamsport Area School District*,
475 U.S. 534 (1986) ....................20

*Board of Education of Central School District No. 1 v. Allen*,
392 U.S. 236 (1968) ....................5, 19, 20

*Bob Jones University v. United States*,
461 U.S. 574 (1983) ....................36

*Butz v. Economou*,
438 U.S. 478 (1978) ....................16, 17, 18

*Citizens for Responsibility & Ethics in Wash. v. United States*,
846 F.3d 1235 (D.C. Cir. 2017 ....................44

*City of South Lake Tahoe v. California Tahoe Regional Planning Agency*,
625 F.2d 231 (9th Cir. 1980) ....................21

*Clarke v. United States*,
705 F. Supp. 605 (D.D.C. 1988), *aff'd* 886 F.2d 404 (D.C. Cir. 1989),
*reh'g denied*, 898 F.2d 161, *vacated as moot*, 915 F.2d 699 (1990) ....................20, 21

*CleanCOALition v. TXU Power*,
536 F.3d 469 (5th Cir. 2008) ....................2

*Cole v. Richardson*,
405 U.S. 676 (1972) ....................13

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ....................21

*Drake v. Obama*,
664 F.3d 774 (9th Cir. 2011) ....................21

*El-Shifa Pharmaceutical Industries Co. v. United States*,
607 F.3d 836 (2010) ....................23

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................38

*Finch v. Mississippi State Med. Ass'n, Inc.*,
585 F.2d 765 (5th Cir. 1978).....21

*Flood v. Kuhn*,
407 U.S. 258 (1972).....38

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006).....36

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004).....8, 35

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 421 (1987).....35

*Lin v. United States*,
561 F.3d 502 (D.C. Cir. 2009).....6

*Little v. Barreme*,
6 U.S.(2 Cranch) 170 (1804).....5, 6, 13, 15

*Medellín v. Texas*,
552 U.S. 491 (2008).....27

*Michigan v. Bay Mills Indian Community*,
134 S. Ct. 2024 (2014).....32

*Moda Health Plan, Inc. v. United States*,
130 Fed. Cl. 436 (2017).....46

*Mohamad v. Palestinian Authority*,
132 S. Ct. 1702 (2012).....36

*Rodearmel v. Clinton*,
666 F. Supp. 2d 123 (D.D.C. 2009).....21, 22

*Tennessee Valley Auth. v. Hill*,
437 U.S. 153 (1977).....46

*United States ex rel. New v. Rumsfeld*,
448 F.3d 403 (D.C. Cir. 2006).....18, 19

*United States ex rel. Oliver v. Philip Morris USA*,
101 F. Supp. 3d 111 (D.D.C. 2015), *aff'd* , 826 F.3d 466 (D.C. Cir. 2016).....33

*United States v. Bansal*,
663 F.3d 634 (3d Cir. 2011).....33

*Wachovia Bank v. Schmidt*,
546 U.S. 303 (2006) .......... 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 7, 22, 25, 27

*Zivotofsky v. Kerry*,
135 S. Ct. 2076 (2015) .......... 7, 15, 27

## CONSTITUTIONAL AND STATUTORY PROVISIONS

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 513 .......... 41

28 U.S.C. §§ 511-13 .......... 41

28 U.S.C. § 1331(a) .......... 1

Act of April 30, 1790, ch. 10, § 12, 1 Stat. 119 (1790) .......... 9

Act of Jan. 11, 1812, ch. 14, § 18, 2 Stat. 671 (1812) .......... 9

Act of July 2, 1862, ch. 128, 12 Stat. 502 (1862) .......... 10, 11

Act of June 1, 1789, ch. 1, § 1, 1 Stat. 23 (1789) .......... 10

Act of March 16, 1802, ch. 9, § 29, 2 Stat. 132 (1802) .......... 9

Act of March 29, 1806, ch. 20, art. 10, 1 Stat 359 (1806) .......... 9

Act of March 3, 1795, ch. 44, § 15, 1 Stat. 430 (1795) .......... 9

Act of May 13, 1884, ch. 46, § 2, 23 Stat. 21 (1884) .......... 10

Act of May 30, 1796, ch. 39, § 21, 1 Stat. 483 (1796) .......... 9

Act of Sept. 29, 1789, ch. 25, § 3, 1 Stat. 95 (1789) .......... 9

Authorization for Use of Military Force Against Iraq Resolution of 2002,
Pub. L. No. 107-243, 116 Stat. 1498 (2002) (50 U.S.C. § 1541 note) .......... 4

Authorization for Use of Military Force,
Pub. L. No. 107-40, 115 Stat. 224 (2001) (50 U.S.C. § 1541 note) .......... 4, 35

Consolidated and Continuing Appropriations Act, 2015,
Pub. L. No. 113-235, 128 Stat. 2130 (2014) .......... 49

Consolidated Appropriations Act, 2014,
Pub. L. No. 113-76, 128 Stat. 5 (2014) .......... 50

Consolidated Appropriations Act, 2016,
Pub. L. No. 114-113, 129 Stat. 2242 (2015) (10 U.S.C. § 801 note) .......... 49, 50

Continuing Appropriations Resolution, 2015,
Pub. L. No. 113-235, 128 Stat. 1867 (2014) ....................................................49

Enlistment oath, 10 U.S.C. § 502(a) ....................................................................9, 11

Fed. R. Civ. P. 12(b)(1)................................................................................................5

National Defense Authorization Act for Fiscal Year 2014,
Pub. L. No. 113-76, 127 Stat. 672 (10 U.S.C. § 801 note) ................................49

National Defense Authorization Act for Fiscal Year 2015,
Pub. L. No. 113-291, 128 Stat. 3292 (10 U.S.C. § 801 note) .............................51

Oath of office, 5 U.S.C. § 3331 ..................................................................1, 11, 13

U.S. Const. art. II, § 3, cl. 4 ....................................................................................27

Uniform Code of Military Justice,
10 U.S.C. §§ 801–946 ..............................................................................................3

War Powers Resolution of 1973, Pub. L. No. 93-148, 87 Stat. 555 (1973)
(codified at 50 U.S.C. §§ 1541-1548 ) ..........................................2, 28, 30, 43, 51

## LEGISLATIVE MATERIALS

119 Cong. Rec. 33,859-60 (1973)..........................................................................26

119 Cong. Rec. 36,202 (1973) ..................................................................................26

147 Cong. Rec. 9949 (Oct. 1, 2001) .........................................................................34

157 Cong. Rec. 8235 (Dec. 5, 2011)..........................................................................38

160 Cong. Rec. H7557 (Sept. 16, 2014) ....................................................................48

*Authorization for Use of Military Force After Iraq and Afghanistan: Hearing Before the S. Comm. on Foreign Relations*, 113th Cong.
459 (2014) .............................................................................................................41

Consolidated Appropriations Act, 2016, H. Comm. on Appropriations, Legislative Text and Explanatory Statement on H.R. 2029/Pub. L. No.
114-113, Book 1 (Comm. Print 2016) ...........................................................49, 50

H.R. Rep. No. 93-287 (1973)....................................................................................26

House Rule XXI.2, 114th Cong. (2015) ...................................................................46

S. Rep. No. 93-220 (1973) ..................................................................25, 26, 45

Standing Rules of the Senate XVI.4, 113th Cong. (2014) ....................................46

War Powers Legislation, 1973: Hearings on S. 440 Before the S. Comm. on Foreign Relations, 93d Cong. 115 (1973)...........................................................45

## ADMINISTRATIVE MATERIALS

Dep't of the Army, Manual for Courts-Martial,
RMC 916(d), at II-110 (2012 ed.) .......................................................... 13

President Barack H. Obama, Letter to Congressional Leaders Reporting on the Deployment of United States Armed Forces Personnel To Iraq and the Authorization of Military Operations in Syria (Sept. 23, 2014) ........ 28, 29, 30

Press Release, Office of the Press Sec'y, Statement by the President on ISIL, The White House (Sept. 10, 2014) .......................................................... 28

Statement of the President on H.R. 1540 (Dec. 31, 2011) ....................................... 39

Susan E. Rice, Letter from Susan E. Rice, Assistant to the President for Nat'l Sec. Affairs, to John A. Boehner, Speaker, U.S. House of Representatives (July 25, 2014) .......................................................... 32

## MISCELLANEOUS

Driesen, David M., *Toward A Duty-Based Theory of Executive Power*,
78 Fordham L. Rev. 71 (2009) .......................................................... 14

Garcia, Michael John & Jennifer K. Elsea, Cong. Research Serv., R43720, *U.S. Military Action Against The Islamic State: Answers To Frequently Asked Legal Questions* .......................................................... 33

Glennon, Michael, *Two Views of Presidential Foreign Affairs Power: Little v. Barreme or Curtiss-Wright?*, 13 Yale J. Int'l L. 5 (1988) ......................... 15, 16

Hickey, Donald R., *The Quasi-War: America's First Limited War, 1798-1801*, 18 The Northern Mariner/le marin du nord, nos. 3-4, 2008 ..................... 14

Michel, Chris, Comment, *There's No Such Thing as a Political Question of Statutory Interpretation: The Implications of Zivotofsky v. Clinton*, 123 Yale L.J. 1253 (2014) .......................................................... 23

Morrison, Trevor W, *Constitutional Alarmism*,
124 Harv. L. Rev. 1688 (2011). .......................................................... 41

Morrison, Trevor W., *Libya, "Hostilities," the Office of Legal Counsel, and the Process of Executive Branch Legal Interpretation*, 124 Harv. L. Rev. F. 62 (2011) .......................................................... 43

Morrison, Trevor W., *Stare Decisis in the Office of Legal Counsel*,
110 Colum. L. Rev. 1448 (2010). .......................................................... 44

Preston, Stephen W., General Counsel, U.S. Dep't of Defense, *The Legal Framework for the United States' Use of Military Force Since 9/11*,

*Address to the Annual Meeting of the American Society of International Law* (Apr. 10, 2015) .....36, 40

Scalia, Antonin & Bryan Garner, *Reading Law* (2012) .....9, 11

Story, Joseph, *Commentaries on the Constitution of the United States* (1833) .....13, 14

Wagner, Gregory A., Note, *Warheads on Foreheads: The Applicability of the 9/11 AUMF to the Threat of ISIL*, 46 U. Mem. L. Rev. 235 (2015) .....33, 34

Younts, Major R. David, *Orders and the Oath: Understanding a Military Officer's Duty to Support and Defend the Constitution*, 39 Reporter 43 (2012) .....14

**COURT DOCUMENTS**

Respondents' Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, *In re: Guantanamo Bay Detainee Litigation*, Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009), ECF No. 1689 .....37

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AUMF | Authorization for Use of Military Force |
| CR | Continuing Appropriations Resolution |
| DOD | Department of Defense |
| ISIL | Islamic State of Iraq and the Levant |
| NDAA | National Defense Authorization Act |
| OIR | Combined Joint Task-Force Operation Inherent Resolve |
| OLC | Office of Legal Counsel |
| UCMJ | Uniform Code of Military Justice |
| WPR | 1973 War Powers Resolution |

## JURISDICTION

Captain Smith alleges violations of the 1973 War Powers Resolution. The District Court therefore had jurisdiction under 28 U.S.C. §1331. The decision he appeals from is final. This Court therefore has jurisdiction under 28 U.S.C. §1291. The District Court's decision was filed on November 21, 2016. The notice of appeal was timely filed on December 19, 2016.

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court correctly decide that Captain Smith has not alleged "injury in fact" sufficient to give him Article III standing to challenge the war against ISIL in Iraq and Syria?

2. Did the District Court correctly decide that the political question doctrine bars adjudication of the merits of Captain Smith's claim that the President has failed to obtain the necessary "specific statutory authorization" from Congress to fight the war against ISIL?

## STATEMENT OF THE CASE

When Army Captain Smith ("Smith") joined the Army in June 2010, he was required to take an Oath of Office that he "will support and defend the Constitution of the United States." 5 U.S.C. §3331.[1] He is nearing the end of his active duty

[1] Pursuant to Circuit Rule 28(a)(5), the text of this and other statutory authorities relied upon is set forth in the Addendum.

service; he will be released from active duty in June 2017.[2] Smith will complete his military service obligation as a "ready reservist" in May 2018. Until then, he will be subject to recall to active duty.

In his final tour of duty, Smith was deployed as an intelligence officer in the Kuwait headquarters of the Combined Joint Task-Force Operation Inherent Resolve ("OIR" or "Operation"), which is the official name of the war ("War") against the Islamic State of Iraq and the Levant ("ISIL"), initiated by the United States and its allies against Iraq and Syria in summer and fall 2014. Smith became aware that Americans at home were debating whether the on-going War violated the 1973 War Powers Resolution ("WPR" or "Resolution"),[3] which prohibits the President from using U.S. military forces in hostilities for more than sixty days without "specific statutory authorization."[4]

As he investigated the issue, he could nowhere find an official, sustained, public explanation of the Administration's legal rationale for the War by the Office of Legal Counsel ("OLC") or the White House Counsel. Smith was left to make an

---

[2] *See* Army Resources Command, Nov. 2, 2016; Orders 024-0128, Jan. 24, 2017. The Court may take judicial notice of these documents. *See generally CleanCOALition v. TXU Power*, 536 F.3d 469, 471 n.2 (5th Cir. 2008).

[3] Pub. L. No. 93-148, 87 Stat. 555 (codified at 50 U.S.C. §§1541–1548). (App. 24.) In this brief we cite to the Public Law.

[4] WPR §5(b). (App. 26.) The requirement also applies in the case of a declaration of war or a national emergency created by an attack on the United States or its armed forces. Those requirements are not at issue in this case.

independent judgment on the matter. All of the publicly available information led him to believe that the President had exceeded his commander-in-chief powers in conducting the War without receiving the "specific statutory authorization" within the sixty-day period required by the Resolution.[5] Given this conclusion, Smith believed that if he supported the War, he would violate his Oath "to support and defend the Constitution of the United States against all enemies, foreign and domestic" and to "bear true faith and allegiance to the same."

Smith faced a dilemma. If he obeyed his orders to support the War, and legal authorities ultimately found that the War was illegal, he would have violated his Oath. But if he disobeyed his orders, and the War was found legal, he could be prosecuted and imprisoned under the Uniform Code of Military Justice ("UCMJ").[6]

To resolve his dilemma, Smith brought this action for a declaratory judgment. He does not seek injunctive or other equitable relief. He simply requests a declaration by this Court that will authoritatively determine whether OIR violates the WPR. Smith will continue to obey orders to support the Operation until his case is finally resolved on the merits.

Captain Smith presented the following claims:

---

[5] *Id.*

[6] 10 U.S.C. §§801-946.

- The President is violating the WPR by continuing to use U.S. military forces in the War without "specific statutory authorization."
- In failing to provide an official, sustained, public explanation of the Administration's legal rationale for the War, the President violated the command of Article II, §3, cl. 5 of the Constitution to "take Care that the Laws be faithfully executed."
- The 2001 Authorization for Use of Military Force ("2001 AUMF")[7] and the Authorization for Use of Military Force Against Iraq Resolution of 2002 ("2002 Iraq AUMF"),[8] do not constitute "specific statutory authorization" for the War.
- The President's "commander-in-chief" authority under Article II, §3 does not override his obligation under the WPR to obtain from Congress "specific statutory authorization" for the War.

As relief, Smith asked the District Court to declare that (1) the President violated the WPR and the Take Care Clause in deploying U.S. military forces in the War for more than sixty days without the requisite congressional authorization, and consequently was required by the WPR to withdraw these forces within the next thirty days; and (2) the President will continue to be in violation of the WPR and the Take Care Clause unless, within sixty days of a final judgment in Smith's favor, he obtains specific statutory authorization for the use of U.S. military forces in the War or, absent such authorization, he disengages them within the next thirty days.

---

[7] Pub. L. No. 107-40, 115 Stat. 224 (codified at 50 U.S.C. §1541 note). (App. 45.)

[8] Pub. L. No. 107-243, 116 Stat. 1498 (50 U.S.C. §1541 note). (App. 48.)

The government moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) for want of jurisdiction, on the ground that (1) Smith lacks standing to assert his claims, (2) his claims raise non-justiciable political questions, (3) there is no waiver of sovereign immunity permitting Smith's claims to proceed, and (4) equitable relief against the President is not permitted.

The District Court granted the government's motion to dismiss on standing and political question grounds. It ruled that Smith lacked standing on the ground that "the specific legal injury about which he complains is not sufficiently concrete . . . or particularized." To reach this conclusion, it rejected Smith's reading of his Oath and *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), as requiring officers to disobey *ultra vires* orders of the President. The court also rejected Smith's reliance on the "oath of office" cases, grounded in *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236 (1968), in which the Supreme Court recognized standing for officials faced with a choice between honoring their oaths and obeying an order they regarded as unconstitutional.

The District Court found that the legality of the War turned on whether the 2001 AUMF and 2002 Iraq AUMF constitute the "specific statutory authorization" required by the WPR. The court ruled that the political question doctrine bars adjudication of *that* question, on the ground that "the issues raised are primarily ones committed to the political branches of government, and the Court lacks

judicially manageable standards, and is otherwise ill-equipped, to resolve them." The court also ruled that Captain Smith's return from Kuwait did not moot his claims because they were "capable of repetition, yet evading review."

## STANDARD OF REVIEW

Dismissals for want of standing and political question grounds are reviewed de novo. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (standing); *Lin v. United States*, 561 F.3d 502, 505 (D.C. Cir. 2009) (political question).

## SUMMARY OF ARGUMENT

*Standing*. The District Court erred in finding that Captain Smith's injury was insufficiently concrete to support Article III standing. Smith's claim is based on his forced choice between following the command of his Oath of Office and *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), and obeying an illegal order of his commander-in-chief. But the District Court failed to give effect to the differences between the Officer's Oath, which commands support of the Constitution, and the Enlistment Oath, which commands obedience to superior officers or the direct applicability of *Little* to the facts of Smith's case. The court also paid no heed to the evolution of the two oaths, which shows that Congress meant this difference. Finally, the court drew distinctions without a difference in rejecting Smith's reliance on the "oath of office" cases of the Supreme Court and this Court.

*Political question*. In *Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) ("*Zivotofsky II*"), the Supreme Court reaffirmed *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) as a crucial precedent governing the application of the political question doctrine. Yet the District Court ignored *Youngstown* in finding that Captain Smith's complaint raised a "political question." Its decision is flatly inconsistent with *Youngstown*, which involved President Truman's order seizing steel mills whose continuing production he deemed essential for the on-going war in Korea. Justice Jackson's landmark concurrence insisted that the President's war-making powers are at their "lowest ebb" when they violate express congressional commands, and that it is the judiciary's task to determine whether the President has indeed violated statutory limitations on his authority. Smith's lawsuit raises the very same question decided by *Youngstown* – only this time, it is the WPR, not Taft-Hartley, which serves as the key statutory restriction on the President's power.

*Youngstown* is flatly inconsistent with the District Court's holding that "certain aspects" of this case are "completely committed to the political branches."

*Youngstown*'s principles, as elaborated in *Zivotofsky II*, also require rejection of the District Court's second holding that "factual questions" raised by this case "are not of the type that the Court is well-equipped to resolve." No controversial fact finding is needed to establish that the AUMFs enacted by Congress in 2001

and 2002 cannot serve as the "specific authorizations" required by the WPR for the President's decision to initiate "hostilities" against ISIL in 2014. Moreover, an adoption of the District Court's conclusion would be to give the President the "blank check" for war, *see Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion), that Congress denied him when it enacted the 2001 AUMF.

Finally, the District Court claims that Congress' decisions to fund OIR in omnibus appropriations acts establish that there is not presently "a dispute between the two political branches regarding the challenged action." Yet this holding ignores provisions in the appropriations measures, as well as those in the WPR, which explicitly repudiate any inference that such funding decisions constitute authorization for the War.[9]

## ARGUMENT

### I. CAPTAIN SMITH SUFFERS INJURY IN FACT BECAUSE HE MUST CHOOSE BETWEEN TWO POTENTIAL HARMS.

#### A. The Officer's Oath Compels Captain Smith To Choose Between Two Potential Harms.

The Officer's Oath requires Smith to "support and defend the Constitution."[10] Smith believes that the President exceeded his constitutional powers in ordering him to support OIR. If he is right, his oath to "support and defend the Constitution" obligates him to disobey his orders.

---

[9] App. 63-96.

[10] 5 U.S.C. §3331.

As the District Court itself recognized,[11] enlistees face no similar dilemma. The Enlistment Oath obligates them to "observe and obey the orders of the President of the United States of America, and the orders of the officers appointed over [them]."[12] Their oath does not by its terms impose a superior obligation to "support and defend the Constitution."

The District Court entirely failed to appreciate the significance of this point in interpreting the statute defining the Officer's Oath.[13] Resort need not be had to the *in pari materia* canon, which counsels that "statutes addressing the same subject matter generally should be read 'as if they were one law,'"[14] because both oaths derive from the *same* Founding Era statute, which established the United States military.[15]

For more than seventy years, officers and enlisted personnel alike recited both oaths.[16] But with the Civil War, the loyalty of the officer corps *to the*

---

[11] App. 79 n.9.

[12] 10 U.S.C. §502(a).

[13] *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006) (citation omitted); *see also* Antonin Scalia & Bryan Garner, *Reading Law* 252-55 (2012) (elaborating the "related statutes" canon of statutory interpretation).

[14] *Schmidt*, 546 U.S. at 305..

[15] Act of Sept. 29, 1789, ch. 25, 1 Stat. 95, 96 (1789).

[16] *See* Act of Jan. 11, 1812, ch. 14, §18. Act of March 16, 1802, ch. 9, §20; Act of March 3, 1795, ch. 44, §15; Act of April 30, 1790, ch. 10, §12; Act of May 30, 1796, ch. 39, §21; The Act of March 29, 1806, ch. 20, art. 10, prescribed the oath for noncommissioned officers and soldiers only.

*Constitution* became a matter of first importance. In 1862, Congress separated the Officer's Oath and the Enlistment Oath, requiring officers, and only officers, in "the civil, military or naval departments of the United States," to swear that they had never supported the Confederacy (the so-called "Test Oath") in a formulation that re-enacted and expanded the original Officer's Oath prescribed by the Act of June 1, 1789.[17] Congress repealed the Test Oath in stages, finally eliminating it in 1884,[18] but the basic Officer's Oath and the Enlistment Oath remained separate.

When Congress enacted the modern Officer's Oath in 1962, its terms, except for punctuation changes, were identical to the core provisions of the 1862 Act:

> I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and

---

[17] Act of July 2, 1862, ch. 128, 12 Stat. 502 (1862):

> I, A. B., do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto; that I have neither sought nor accepted nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto. *And I do further swear (or affirm) that, to the best of my knowledge and ability, I will support and defend the Constitution of the United States, against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion, and that I will well and faithfully discharge the duties of the office on which I am to enter, so help me God.*

(emphasis added). The italicized portion of this formula continues to serve as the Officers Oath today. *See infra* text accompanying note 19.

[18] Act of May 13, 1884, ch. 46, 23 Stat. 22 (1984).

> domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

5 U.S.C. §3331.[19] The modern Enlistment Oath similarly followed the 1862 statute in committing service members to "obey the orders of the President," and does not require them to "support and defend the Constitution."[20]

The District Court nevertheless treated the Officer's Oath as if it were identical in substance to the Enlisted Oath—requiring Captain Smith to "obey the commands of the President" rather than "support and defend the Constitution." In doing so, the court ignored the plain language of the statutes and violated both the well-established canons requiring courts to heed significant variations in texts and counseling against reading one statutory provision as if it were a carbon-copy of another.[21]

In turning its back on history and text, the District Court appealed to a single Supreme Court decision: *Cole v. Richardson*.[22] But the meaning of the Officer's Oath was in no way involved in *Richardson*. This 1972 decision involved a challenge to a McCarthy-era Massachusetts statute requiring all state employees to

---

[19] Act of July 2, 1862, ch. 128 (emphasis added).

[20] 10 U.S.C. §502(a).

[21] *See* Antonin Scalia & Bryan Garner, *Reading Law*, 170-73, 174-79 (2012) ("material variation" canon and "rule against surplusage").

[22] 405 U.S. 676, 684 (1972).

take a loyalty oath pledging themselves to "oppose the overthrow of the government of the United States of America or of this Commonwealth by force, violence or by any illegal or unconstitutional method."[23]

This broad prohibition raised obvious vagueness and due process questions. The District Court construed the statutory language to avoid reaching these questions. It held that the Massachusetts oath was not "so vague as to amount to a violation of due process" because it did not "impose obligations of specific, positive action on oath takers."[24] In relying on *Richardson*, the District Court failed to appreciate the avoidance principle motivating the Supreme Court's interpretation of the Massachusetts oath. It erroneously viewed *Richardson* as establishing a one-size-fits-all formula for oaths—state and federal, civilian and military— citing it for the proposition that the Officer's Oath has "been interpreted to mean simply a commitment to abide by our constitutional system."[25]

The District Court's fear that a different interpretation of the Oath would open the floodgates to "self-help" disobedience (App. 76) is unfounded. Indeed, it is only the denial of standing that may have this impact. After all, Smith has consistently affirmed that he will obey orders to support OIR pending final resolution of this case. In contrast, if Smith is denied his day in court,

---

[23] *Id*. at 678.
[24] *Id*. at 684-85.
[25] *Id*. at 677-78.

conscientious officers will immediately confront the dilemma posed by their Oaths—and some may respond by disobeying the President's commands even at the risk of court-martial.[26] It follows that the District Court got it precisely backwards: "Military discipline" serves as a reason for granting Captain Smith standing, not denying it.

### B. *Little* Requires Officers To Disobey the President's Orders When They Exceed His Powers as Commander-In-Chief.

Captain Smith has standing not only under §3331 but under the Supreme Court's decision in *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804). Written by Chief Justice Marshall for a unanimous Court, the case established that a military officer must disobey orders of the President that are beyond his statutory authority. In Joseph Story's words:

> The officers of [the three branches of government] are equally bound by their oaths of office to support the constitution of the United States, and are therefore conscientiously bound to abstain from all acts, which are inconsistent with it. Whenever, therefore, they are required to act in a case, not hitherto settled by any proper authority, these

[26] The current Army Manual states that disobedience to an order is excused only if "the accused knew it to be unlawful or a person of ordinary sense and understanding would have known it to be unlawful." *See* Dep't of the Army, *Manual for Courts-Martial*, RMC 916(d), at II-110 (2012 ed.). It is unnecessary to speculate how particular courts-martial would apply this standard in the case of oath-motivated acts of disobedience. It is enough to say that Smith and other officers would have to gamble that their disobedience would generate a guilty verdict.

> functionaries must, in the first instance, decide, each for himself, whether, consistently with the constitution, the act can be done.[27]

*Little* arose out of the Quasi War, an undeclared and limited war fought almost entirely at sea between the United States and the French Republic from 1798 to 1801. The French Republic, believing that the United States had sold out to Great Britain in the Jay Treaty of 1794, "unleashed its warships and privateers on American commerce."[28] Among several countermeasures, Congress authorized President John Adams to order U.S. naval officers to stop any American ship they believed to be bound for a French port, and to seize the ship if, upon searching it, it appeared to be so bound.

President Adams, however, ordered his commanders to seize American vessels coming *from* France as well as those going *to* France. Pursuant to those orders, George Little, commander of the U.S. frigate *Boston*, seized the *Flying*

---

[27] 1 Joseph Story, *Commentaries on the Constitution of the United States* bk. III, § 374, at 345 (1833); *see also* Major R. Davis Younts, *Orders and the Oath: Understanding a Military Officer's Duty to Support and Defend the Constitution*, 39 Reporter 43, 45 (2012) ("The formation of a military that falls under the authority of elected civilians, but swears an oath of loyalty to the Constitution rather than to an individual or a position, raises a potential concern for military officers. Loyalty to the Constitution might require them to disobey or disregard the orders of the President as Commander-in-Chief."); David M. Driesen, *Toward a Duty-Based Theory of Executive Power*, 78 Fordham L. Rev. 71, 85 (2009) ("[T]he General Oath Clause requires federal officials to disobey the President when he orders them to violate the law.").

[28] *See* Donald R. Hickey, *The Quasi-War: America's First Limited War, 1798-1801*, 18 The Northern Mariner/le marin du nord, nos. 3-4, 2008, at 69.

*Fish*, a vessel carrying Danish papers and sailing from a French port, and sought to have her condemned. Little was unaware of the statute circumscribing the President's authority.

Professor Michael J. Glennon describes the issue before the Justices:

> The central issue in the condemnation proceedings was not whether the *Flying Fish* should be condemned; Chief Justice Marshall agreed with the courts below that the seizure of a neutral vessel was unlawful. Rather, the issue was whether the Danish owners of *Flying Fish* should be awarded damages for the injuries they suffered. Little's defense was that he merely followed orders, and that those orders excused him from liability. Because the *Flying Fish* fell squarely within the class of ships that the President had ordered seized, the Supreme Court had to consider whether the President's orders immunized his officer personally from an action for damages arising under the statute.[29]

The Supreme Court rejected Little's "following orders" defense. It stated that President Adams' instructions "cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass."[30] Accordingly, "[a] commander of a ship of war of the United States, in obeying his instructions from the President of the United States, acts at his peril."[31]

---

[29] Michael J. Glennon, *Two Views of Presidential Foreign Affairs Power: Little v. Barreme or Curtiss-Wright*, 13 Yale J. Int'l L. 5 (1988) [hereinafter Glennon, *Two Views*]. The Supreme Court cited Professor Glennon's article with approval in *Zivotosky II*, 135 S. Ct. at 2090.

[30] 6 U.S. (2 Cranch) at 179.

[31] *Id.*

The facts of the present case are strikingly similar to those confronting the *Little* Court. As in *Little*, Congress carefully limited the President's powers—in Captain Little's case, through a specific statutory enactment, and in Smith's case, through the WPR, which requires a specific congressional enactment. As in *Little*, the President's orders exceed the limits set by Congress, expanding the United States' risk of involvement in hostilities "significantly beyond what Congress had contemplated."[32] Unlike Captain Little, however, Captain Smith is aware of the statute limiting the President's authority, and thus knew the question he confronted: "Should I obey Congress or the President, where the President has exceeded the authority granted by Congress?" The Marshall Court's answer in *Little* was clear and unequivocal: Officers have an overriding obligation to follow Congress, even at the cost of disobeying the President.

In modern times, the Supreme Court, in *Butz v. Economou*[33] and, more recently in *Zivotofsky II*,[34] has twice affirmed the continuing vitality of the foundational principle expounded by *Little*. But the District Court ignored the key discussion of *Little* in *Zivotofsky II*[35] and quoted a sentence of dicta from *Butz* as if it disposed of the very different problems raised by Smith's case. In the court's

---

[32] Glennon, *Two Views*, at 7.
[33] 438 U.S. 478 (1978).
[34] For further discussion of the key passage, see text accompanying notes 64 to 67.
[35] App. 76.

view, *Butz* cited *Little* to establish that "a federal official [is] protected for action tortious under state law only if his acts were authorized by controlling federal law."[36] It therefore concluded that "*Little* does not stand for the proposition, as Smith argues, that military personnel have a duty to disobey orders they believe are beyond Congressional authorization."[37]

The District Court's cramped reading is unjustified. In speaking for the Court, Justice White also explained that the decision stood for "the general rule, which long prevailed, that a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers."[38]

The choice between the broad and narrow readings of *Butz* requires a fuller account of the facts than the District Court provided. *Butz* did not involve the obligations of military officers to Congress, but a very different issue. The case was brought by a private party against officials in the Department of Agriculture who, the litigant alleged, had brought administrative actions against him in retaliation for his criticism of the agency, and had thereby violated the First Amendment. The lower court dismissed the suit on the ground that the government officials had absolute immunity. The Supreme Court disagreed, holding that these

---

[36] App. 76 (citing *Butz*, 438 U.S. at 490).
[37] App. 76.
[38] 438 U.S. at 489-90.

federal officers only had a qualified immunity against damage actions for asserted constitutional violations.

In reaching this conclusion, Justice White invoked *Little* for what he called the "general rule," under which "a federal official who acted outside of his federal statutory authority would be held strictly liable for his trespassory acts."[39] But *Butz* by no means ruled that *Little* stands *only* for that "proposition," especially where the special duties of military officers to follow congressional commands are concerned.

Nevertheless, the District Court ignored the special facts raised by *Butz*, and treated a single sentence of dicta as if it were dispositive in Smith's case.

The District Court also cited this Court's decision in *United States ex rel. New v. Rumsfeld*[40] to support its view that "in the post-*Little* era . . . there is no right, let alone a duty, to disobey military orders simply because one questions the Congressional authorization of the broader military effort." (App. 76.) As with *Butz*, the District Court placed more weight on *New* than the case will bear.

In *New*, this Court affirmed the District Court's dismissal of a service member's habeas petition collaterally attacking his court-martial conviction for disobeying a lawful command. The command was to wear a certain uniform on his

[39] *Id.*
[40] 448 F.3d 403 (D.C. Cir. 2006).

deployment to the Republic of Macedonia as part of the United Nations Preventive Deployment Force. One of New's claims was that the deployment itself was unlawful because the President had not obtained what he viewed as requisite congressional authorization. This Court found that New's deployment claim presented a non-justiciable political question in the special context of a court-martial, "even though that application might be highly contestable in another context."[41] Nothing in *New* vitiates *Little* in a challenge to a deployment order "in an otherwise properly framed civil suit."[42]

### C. Captain Smith Has Standing Under the Oath-Taker Cases.

*Board of Education of Central School District No. 1 v. Allen*[43] further supports Smith's claim. The Supreme Court held that a civilian official in Captain Smith's position has standing to seek declaratory relief. Local Boards of Education in New York challenged a state law requiring school districts to provide textbooks to parochial school students as violative of the Establishment and Free Exercise Clauses. Like Smith, Board members had to choose between enforcing the law and sacrificing their official positions.

The Court held that the Boards had standing:

---

[41] *Id.* at 411.

[42] *Id.*

[43] 392 U.S. 236 (1968).

> Appellants have taken an oath to support the United States Constitution.
>
> Believing s 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step— refusal to comply with s 701— that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation.[44]

The *Allen* doctrine was reaffirmed by the Supreme Court in 1986 in *Bender v. Williamsport Area School District*,[45] and was followed by the District Court of this Circuit in an opinion by Chief Judge Lamberth, in *Clarke v. United States*.[46] In *Clarke*, Judge Lamberth held that, under *Allen*, the members of the D.C. Council had standing to challenge the constitutionality of a federal law that required the Council to amend a D.C. law, on pain of losing all federal funds.[47] This Court affirmed.[48]

The District Court, however, stated that it "found persuasive the opinions of various Courts of Appeals that have questioned whether such 'oath-taker' cases would still be considered sufficiently 'concrete' under modern Supreme Court

---

[44] *Id.* at 249 n.5 (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

[45] 475 U.S. 534, 545 (1986) (applying *Allen* but finding no standing).

[46] 705 F. Supp. 605 (D.D.C. 1988).

[47] *Id.* at 608.

[48] 886 F.2d 404 (D.C. Cir. 1989), *reh'g denied*, 898 F.2d 161, *vacated as moot*, 915 F.2d 699 (1990).

standing precedent."[49] But in the only case cited by the District Court, *Drake v. Obama*,[50] the Ninth Circuit was bound by its pre-*Bender* decision in *City of South Lake Tahoe v. California Tahoe Regional Planning Agency*.[51] Judge Lamberth specifically declined to follow *Lake Tahoe* because "the Supreme Court . . . subsequently reaffirmed *Allen*" in *Bender*.[52]

The District Court also likened this case to the oath of office case presented in *Rodearmel v. Clinton*.[53] In that case, Rodearmel, a Foreign Service Officer, challenged as unconstitutional then-Secretary of State Hillary Clinton's appointment and continuance in office. Rodearmel alleged that he had Article III standing under *Allen* and *Clarke* because he was forced to choose between, on the one hand, serving under the Secretary and violating his commissioning oath to "support and defend the Constitution," and, on the other hand, refusing to serve the Secretary and placing himself at substantial risk of sanctions. A three-judge panel found Rodearmel's reliance on *Allen* and *Clarke* misplaced:

> In contrast to the plaintiffs in *Allen* and in *Clarke*, Rodearmel has not alleged that he has been required to take any action that he believes is

---

[49] App. 79.

[50] 664 F.3d 774 (9th Cir. 2011).

[51] 625 F.2d 231 (9th Cir. 1980).

[52] 705 F. Supp. at 608 n.4. In its motion to dismiss, the government also relied on the Fifth Circuit's decision in *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015), but there, too, the circuit court was bound by a pre-*Bender* decision, *Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765 (5th Cir. 1978).

[53] 666 F. Supp. 2d 123 (D.D.C. 2009).

> itself unconstitutional and that would therefore lead him to violate his oath of office. In both *Allen* and *Clarke*, the plaintiffs either had to take an action that they believed violated the Constitution or risk a concrete injury. Rodearmel, on the other hand, merely alleges that "serving under, taking direction from, and reporting to" Clinton would be contrary to his oath of office without alleging the specific constitutional violation that he believes he would be committing by remaining under her supervision.[54]

Captain Smith, by contrast, *has* been ordered "to take an action"—supporting OIR—that he believes exceeds the President's authority, in violation of the WPR, and, hence, violates Captain Smith's oath of office.

## II. THIS CASE DOES NOT RAISE A "POLITICAL QUESTION."

The District Court advanced three reasons for invoking the "political question" doctrine. First, "certain aspects . . . are . . . completely committed to the political branches of government." Second, "factual questions . . . are not of the type that the Court is well-equipped to resolve." Third, this case does not present "a dispute between the two political branches regarding the challenged action." (App. 89-91.)

All three holdings fail to recognize the judiciary's supreme responsibility, under *Youngstown*, to safeguard "the equilibrium established by our constitutional system," when presidential power is at its "lowest ebb."[55]

---

[54] *Id.* at 130 (citations omitted).

[55] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J., concurring).

Sitting *en banc*, this Court did not challenge this key *Youngstown* principle in *El-Shifa Pharmaceutical Industries Co. v. United States*.[56] The Court stated:

> [W]e have distinguished between claims requiring us to decide whether taking military action was "wise"—"a 'policy choice[ ] and value determination [ ] constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch'"—and claims "[p]resenting purely legal issues" such as whether the government had legal authority to act. The political question doctrine bars our review of claims that . . . call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion.[57]

Captain Smith's case squarely "'[p]resent[s] purely legal issues' such as whether the government had legal authority to act."

Since *El-Shifa* was decided in 2010, the Supreme Court further reinvigorated *Youngstown*, and its application to *Little v. Barreme*, in *Zivotofsky II* in 2015. While *Zivotofsky II*'s statement of principle plays a key role in the following argument, it is unnecessary to consider the extent to which it requires a revision of *El Shifa*'s restrictive approach to *Youngstown*—since, as we shall show, its concerns about judicial fact-finding capacities are not applicable in the present case.

---

[56] 607 F.3d 836 (2010).

[57] *Id.* at 842. *See generally*, Chris Michel, Comment, *There's No Such Thing as a Political Question of Statutory Interpretation: The Implications of Zivotofsky v. Clinton*, 123 Yale L.J. 1253 (2014).

### A. The District Court Ignored *Youngstown* in Determining Whether the Case Raises Issues "Completely Committed To The Political Branches."

The Court rightly treats *Baker v. Carr* as a leading source for general standards governing the political question doctrine. But it entirely ignored our claim that *Youngstown* also serves as a crucial precedent.

*Baker* involved reapportionment, but *Youngstown* dealt with the President's powers over foreign affairs and his authority as commander-in-chief. In Smith's case, as in *Youngstown*, Congress explicitly limited these powers by statute in the WPR. *Youngstown* refutes the District Court's assertion that Smith's challenge raises questions that are "completely committed to the political branches."[58]

In *Youngstown*, the Supreme Court rejected President Harry Truman's claim that, as commander-in-chief, he could disregard the Taft-Hartley Act to guarantee the continued steel production he deemed essential for the on-going war in Korea. The case is best known for Justice Jackson's concurrence breaking down presidential power into three categories. Category One involves situations in which the President acts under the authority of particular provisions in Article II. There, his unilateral powers are at a maximum. Category Two represents a "twilight zone" in which the President and Congress can both make colorable claims to authority. In Category Three, the President's power is "at its lowest ebb," since he is acting in

---

[58] App. 89.

a manner "incompatible with the…. will of Congress." In these cases, courts must "scrutinize[]" presidential assertions of power, since "what is at stake is the equilibrium established by our constitutional system."[59]

Justice Jackson's concurrence played a central role in framing congressional debate over the WPR. In its Report on the Resolution, the Senate Foreign Relations Committee explicitly rested on Justice Jackson's concurrence:

> As the late Supreme Court Justice H. Robert Jackson pointed out in his concurring opinion in *Youngstown Steel Corp. v. Sawyer*, there is a discrete "zone of twilight" between the discrete areas of Presidential and Congressional power. Politics, like nature, abhors a vacuum. When Congress created a vacuum by failing to defend and exercise its powers, the President hastened to fill it. As Justice Jackson commented, "Congressional inertia, indifference or quiescence, may sometimes, at least as a practical matter, enable, if not invite, measures on independent Presidential responsibility…." [citing *Youngstown*, 343 U.S. 579 (1952)].[60]
>
> To assert power is not, however, to legitimize it.[61]

As the Report emphasizes, the WPR aims to move the President's war powers from Category Two to Category Three—taking it out of the "twilight zone" and making it clear that, henceforth, the commander-in-chief's power is at "its lowest ebb" if he should ever defy the WPR's strict time limits on unilateral

---

[59] *Youngstown*, 343 U.S. at 638.

[60] This passage from *Youngstown* can be found in the final paragraph of Justice Black's opinion of the Court, *id*. at 589.

[61] S. Rep. No. 93-220 at 15 (1973).

presidential war making. To make this even clearer, the Committee begins its Report with this statement by Jacob Javits, the Resolution's sponsor:

> My cosponsors and I regard this bill as basic national security legislation . . . .We live in an age of undeclared war, which has meant Presidential war. Prolonged engagement in an undeclared Presidential war has created a most dangerous imbalance in our Constitutional system of checks and balances. . . . [The bill] is rooted in the words and the spirit of the Constitution. It uses the clause of Article I, Section eight to restore the balance which has been upset by the historical enthronement of that power over which the framers of the Constitution regarded as the keystone of the whole Article of Congressional power – the exclusive authority of Congress to declare war; the power to change the nation from a state of peace to a state of war.[62]

This theme was elaborated time and again in the course of congressional deliberations.[63]

Given its centrality to Smith's case, the District Court's failure to discuss *Youngstown* is especially remarkable in light of the Supreme Court's recent decision in *Zivotofsky II*. *Zivotofsky II* involved a Category One case. There, the Court struck down limits that Congress tried to place on presidential powers expressly conferred by the Reception Clause, granting the President exclusive

---

[62] S. Rep. No. 93-220 at 2 (1973).

[63] *See* H.R. Rep. No. 93-287 at 4 (1973) (the parallel House Committee Report). These fundamental points reemerged during the debates leading to the override of President Nixon's veto. *See, e.g.*, 119 Cong. Rec. 36,202 (1973) (statement of Rep. Zablocki); 119 Cong. Rec. 33,859-60 (1973) (statement of Rep. Broomfield).

power to extend recognition to foreign nations.[64] Writing for the Court, Justice Kennedy warned against an expansive reading of its decision. Not only did he reject the government's claim to "broad, undefined powers over foreign affairs."[65] He cautioned future courts to recognize that:

> In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. See, *e.g.*, *Medellín v. Texas*, 552 U.S. 491, 523–532(2008); *Youngstown*, 343 U.S. at 589; *Little v. Barreme*, 2 Cranch 170, 177-79.[66]

While the District Court cites *Zivotofsky II* for other purposes, it ignores its reaffirmation of *Youngstown* and its explicit pairing with *Little*'s demand that the President obey congressional limitations on his power as commander-in-chief. This failure to engage in the requisite Category Three scrutiny undermines the District Court's broad assertion that Captain Smith's challenge raises issues "completely committed to the political branches."

---

[64] Const. art. II, §3, cl. 4.

[65] 135 S. Ct. at 2090.

[66] *Id*. Three of the dissenting Justices embraced *Little* just as firmly. *See id*. at 2114 (Roberts, C.J., joined by Alito, J., dissenting); *id*. at 2125 (Scalia, J., joined by Roberts, C.J., and Alito, J., dissenting). Justice Thomas did not address the issue.

### B. This Case Does Not Involve "Factual Questions" Which the Judiciary Is Poorly "Equipped To Resolve."

Section 5(b)(3) of WPR is a key provision. It requires the President to obtain "specific statutory authorization" from Congress within sixty days of his initiation of "hostilities." If he fails, he must terminate operations within the next thirty days.[67]

This provision came into play on September 10, 2014, when President Obama announced an open-ended campaign against ISIL in a televised address to the nation.[68] He followed up with a letter to Congress on September 23rd.[69] Since the September 10 speech triggered the 60/90 day deadline, President Obama was required to withdraw American forces by December, 2014, making the ongoing activities of OIR illegal under the WPR. This is the critical factual finding that serves as the basis of the current appeal.[70] The District Court made the letter a centerpiece of its analysis, singling out the following paragraphs:

> I have directed these actions, which are in the national security and foreign policy interests of the United States, pursuant to my constitutional and statutory authority as Commander in Chief

---

[67] War Powers Resolution §5(b)(3), 50 U.S.C. §1544(b)(3).

[68] *See* Press Release, Office of the Press Sec'y, Statement by the President on ISIL, The White House (Sept. 10, 2014) ("Press Release").

[69] *See* President Barack H. Obama, Letter to Congressional Leaders Reporting on the Deployment of United States Armed Forces Personnel to Iraq and the Authorization of Military Operations in Syria (Sept. 23, 2014) [hereinafter Obama Letter].

[70] *See* Press Release.

> (*including the authority to carry out Public Law 107–40 and Public Law 107–243*) and as Chief Executive, as well as my constitutional and statutory authority to conduct the foreign relations of the United States.
>
> I am providing this report as part of my efforts to keep the Congress fully informed, consistent with the War Powers Resolution (Public Law 93–148). I appreciate the support of the Congress in this action.[71]

This letter asserts that the War falls within the authorizations enacted by Congress more than a decade earlier, so there was no need to obtain the "specific authorization" of the 2014 Congress required by Section 5(b)(3). This is the legal point of the President's references (in a parenthetical) to the 2001 AUMF targeting Al Qaeda in Afghanistan and the 2002 Iraq AUMF targeting Saddam Hussein's regime. During his remaining time in office, the President never provided more than these bare assertions of legal authority.

The District Court refused to evaluate these presidential claims on the ground that they required fact-finding that judges are "not well-equipped to resolve."[72] This holding is erroneous. *Youngstown* scrutiny requires the use of standard techniques of statutory interpretation. No elaborate fact-finding is required to find that the AUMFs of 2001 and 2002 do not amount to the "specific statutory authorization" required by the WPR, or give the President a "blank check" for war.

---

[71] App. 65, citing Obama Letter, *supra* (emphasis added).
[72] App. 96.

Before proceeding to the AUMFs, one additional provision of the WPR requires attention. Section 8(c) specifies the types of American military involvement that initiate "hostilities" triggering the sixty-day period for obtaining congressional consent. It defines the "introduction of United States Armed Forces" to include:

> the assignment of member[s] of such armed forces to command, *coordinate*, participate in the movement of, or *accompany* the regular or *irregular* military forces of *any foreign country or government* when such military forces are engaged, or there exists an *imminent threat* that such forces will become engaged, in hostilities.[73]

This broad definition comes into play in assessing one factual statement made by President Obama in his September 10th speech announcing the campaign against ISIL. He reassured the nation that his intervention "would not involve American combat troops fighting on foreign soil."[74] But given the broad terms of Section 8(c), this does not suffice to escape the 60/90 day timetable imposed by the WPR. OIR plainly involves the use of combat-ready air and ground forces to "accompany" the "regular" or "irregular" forces of the Iraqi army or Syrian opposition in ways that assist their "engagement" in "hostilities." No controversial fact-finding is required to make this point—it is conceded on all sides. It suffices to trigger Section 8(c).

---

[73] WPR, §8(c) (App. 28), 50 U.S.C. 1547(c) (emphasis added).
[74] Obama Letter, *supra*.

### C. The 2001 and 2002 AUMFs Do Not Authorize "Hostilities" Against ISIL.

#### 1. The 2002 AUMF.

Section 3(a) of the 2002 AUMF authorizes the President to introduce American forces "as he determines to be necessary and appropriate to defend . . . the national security of the United States against the continuing threat posed by Iraq." This provision raises three problems of interpretation: One problem involves the bare statutory question of whether a threat "*by* Iraq" includes a threat "emanating *from* Iraq"; a second problem involves the Administration's assertions regarding Syria; and a final problem involves its assertions regarding Iraq.

**A. Statutory Language**. The District Court asserted, almost as an afterthought, that the 2002 Iraq AUMF authorizes U.S. military operations in Syria.[75] The court did not reason its way to that conclusion. Instead, it accepted uncritically an Obama Administration official's bare assertion that even though the AUMF by its terms authorizes the President only to address threats "by Iraq," it "has always been understood to authorize" U.S. military operations to address threats "emanating from Iraq." The official offered no support for his claim, and the District Court did not scrutinize its factual basis. (The official asserted that Congress has "ratified" this understanding through funding measures, a justification we refute later in this brief.) Further analysis was demanded, to say the

[75] App. 68.

least, because "'Congress wrote the statute it wrote'—meaning, a statute going so far and no further."[76]

B. **Iraq**. On July 25, 2014, National Security Advisor Rice sent a letter to the Speaker of the House which stated:

> With American troops having completed their withdrawal from Iraq on December 18, 2011, the Iraq AUMF is no longer used for any U.S. government activities and the Administration fully supports its repeal.[77]

Rice's letter was transmitted on July 25, 2014—two months before the President asserted, on September 23rd, that the 2002 AUMF made it unnecessary to gain the consent of Congress.

The District Court failed to cite or discuss the Rice letter. If it had taken its *Youngstown* responsibilities seriously, it should have treated the letter as dispositive. Since the Administration had declared that the AUMF was no longer operative after December 18, 2011, when "American troops . . . completed their withdrawal from Iraq," it could not serve as the "specific" congressional authorization required under the WPR for the reintroduction of "United States Forces" into the new round of "hostilities" against ISIL in 2014.

---

[76] *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024, 2033-34 (2014).

[77] Letter from Susan E. Rice, Assistant to the President for Nat'l Sec. Affairs, to John A. Boehner, Speaker, U.S. House of Representatives (July 25, 2014). (App. 55.)

This conclusion requires straightforward legal reasoning, without the need for controversial findings of fact. Under the stringent "scrutiny" required by *Youngstown*, the President's invocation of the 2002 AUMF cannot stand.

The District Court's failure to consider Ms. Rice's letter is particularly serious in light of its subsequent history. Since the letter was addressed to the Speaker of the House, it was placed on the website of the House Foreign Affairs Committee—where it remained for many months, until it was removed without notice sometime in 2015.[78] This remarkable removal of a critical document from

---

[78] We retrieved Ms. Rice's letter by means of the Internet Archive Wayback Machine, which is an internet program that archives images of public websites. *Internet Archive Frequently Asked Questions*, Internet Archive, https://archive.org/about/faqs.php (last visited Feb. 11, 2017). The Internet Archive Wayback Machine is operated by the Internet Archive, a non-profit organization dedicated to "offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format." *About the Internet Archive*, Internet Archive, https://archive.org/about/ (last visited Feb. 11, 2017). The Internet Archive is a lead partner for the digital preservation efforts of the Library of Congress. *Internet Archive*, Library of Congress, http://www.digitalpreservation.gov/partners/ia.html (last visited Feb. 11, 2017). Federal courts, including the U.S. District Court for the District of Columbia, have cited to webpages archived by the Internet Archive Wayback Machine. *See, e.g.*, *United States ex rel. Oliver v. Philip Morris USA*, 101 F. Supp. 3d 111, 117-23 (D.D.C. 2015), *aff'd*, 826 F.3d 466 (D.C. Cir. 2016). Federal prosecutors have used webpages archived by the Internet Wayback Machine in the course of criminal prosecutions. *See, e.g. United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011). Before it was removed from the House website, Ms. Rice's letter was cited by Michael John Garcia & Jennifer K. Elsea, Cong. Research Serv., R43720, U.S. Military Action Against The Islamic State: Answers To Frequently Asked Legal Questions 8 n.42 (2014), and Gregory A. Wagner, Note, *Warheads on Foreheads: The Applicability of the 9/11 AUMF to*

the public record only emphasizes the need for the judiciary to subject this critical legal document to *Youngstown* "scrutiny" —not only by this Court but by the general public.

**C. Syria.** The 2002 AUMF also cannot justify continuing hostilities against ISIL in Syria. Once again, the Rice letter makes it unnecessary to engage in any controversial fact-finding. Since it establishes that the AUMF cannot operate as "specific" authorization for renewed "hostilities" against ISIL in Iraq, it follows *a fortiori* that it doesn't authorize military operations in Syria either.

### 2. The 2001 AUMF Does Not Authorize the War.

Immediately after September 11th, President George Bush proposed an AUMF that would have granted him authority "to deter and pre-empt any future acts of terrorism or aggression against the United States."[79] But the congressional leadership rejected this request. Instead, the House and Senate authorized the President only "to use all necessary and appropriate force against those nations, organizations or persons he determines planned, authorized, harbored, committed, or aided in the planning or commission *of the attacks against the United States that occurred on September 11, 2001*" (emphasis added). Moreover, section 2(b) of the

---

*the Threat of ISIL*, 46 U. Mem. L. Rev. 235, 238 n.9 (2015)—further confirming the publication of the letter before its suppression.

[79] For the text of President Bush's proposal, see 147 Cong. Rec. 9949 (Oct. 1, 2001) (statement of Sen. Byrd).

AUMF explicitly provided that "[n]othing in this resolution supersedes any requirement of the War Powers Resolution."[80] Instead of giving the President a "blank check," to use Justice O'Connor's phrase,[81] these provisions emphasize the need for the President to return to Congress for "specific authorization" under the WPR if he wished to initiate "hostilities" against organizations that were not involved in the September 11th attacks.

This is precisely what President Obama failed to recognize in his September 23rd letter to Congress. Since ISIL did not exist on September 11, 2001, it is not an "organization" that the President may target under the terms of the 2001 AUMF. The plain meaning of these provisions demands special respect where, as here, the congressional leadership rejected President Bush's original proposal precisely because it would have authorized combat against terrorist organizations arising in the future. As the Supreme Court has emphasized, there are "[f]ew principles of statutory construction . . . more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."[82] The Court has repeatedly invoked this "canon against

---

[80] 2001 AUMF. (App. 45.)

[81] *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion).

[82] *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987).

rejected proposals" in cases, like the present one, in which Congress self-consciously refused to accept the alternative.[83]

Yet the District Court entirely failed to analyze the crucial statutory language limiting presidential authority. It relied instead on a speech given by Stephen Preston, General Counsel of the Department of Defense.[84] Preston's speech, however, also failed to confront the plain language of the AUMF, despite his concession that ISIL's origins do not go back before 2003. He nevertheless asserts that the scope of the AUMF may be expanded beyond its text to authorize the President to designate ISIL either as an "associated force" or as otherwise included within the war-making powers of the commander-in-chief.

But the term "associated forces" does not appear anywhere in the 2001 AUMF. The term appears in a government memorandum filed in one of the

---

[83] *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579 (2006); *Bob Jones University v. United States*, 461 U.S. 574, 600-601 (1983). Since members of the House and Senate were entirely aware of President Bush's initial AUMF proposal, the canon still applies even though it was rejected before it reached the floor. *See Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1710 (2012).

[84] Stephen W. Preston, General Counsel, U.S. Dep't of Defense, The Legal Framework for the United States' Use of Military Force Since 9/11, Address to the Annual Meeting of the American Society of International Law (Apr. 10, 2015). As reported on this website, Mr. Preston's speech is not paginated. As a consequence, we follow the government's practice, and will quote from the speech without any page citations.

Guantanamo Bay habeas cases in March 2009,[85] and in the 2012 NDAA. In both cases, the 2001 AUMF was invoked as authority to detain captives—not to initiate hostilities against organizations that did not exist on September 11, 2001.[86] Indeed, in granting the President power to detain members of "associated forces" in 2012, Congress self-consciously refused to authorize the initiation of hostilities against "associated forces" that were not involved in the September 11th attacks.

The 2012 NDAA represents the only occasion on which Congress has self-consciously addressed the question of expanding the scope of the 2001 AUMF. Nevertheless, the District Court ignored our arguments directed to its significance.

The issue was at the heart of congressional deliberations. The House Armed Services Committee adopted a provision that would have expressly expanded the 2001 AUMF's authority to include the initiation of hostilities. It expressly "affirmed" the President's authority under the 2001 AUMF to target "associated forces" of Al Qaeda or the Taliban "that are engaged in hostilities against the United States or its coalition partners or . . . have engaged in hostilities *or have*

---

[85] Respondents' Memorandum Regarding The Government's Detention Authority Relative To Detainees Held At Guantanamo Bay, *In re: Guantanamo Bay Detainee Litigation*, Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009), ECF No. 1689 ("Respondents' Memorandum").

[86] *Id.* ("Affirmation Of Authority Of The Armed Forces Of The United States To Detain Covered Persons Pursuant To The Authorization For Use Of Military Force."); Respondents' Memorandum.

*directly supported* hostilities in aid of" the original September 11th attackers.[87] But when this provision reached the Senate, it was explicitly rejected and replaced by a section which eliminated any language which could have expanded the President's authority beyond his power to detain members of "associated forces."[88]

In short: In both 2001 and 2012, Congress self-consciously considered a provision which would have expanded the President's power to engage in hostilities against groups that came into existence after September 11—and on both occasions, it refused to endorse this major expansion of presidential authority. The "canon against rejected proposals" applies with special force in cases of repeated and deliberate congressional repudiation of an alternative approach.[89]

President Obama's response to the 2012 NDAA is also relevant. When he signed the bill into law, he issued a statement expressing "serious reservations with certain provisions that regulate the detention, interrogation, and prosecution of

---

[87] See H.R. 1540, Section 1034, 3(A) and 3(B) (emphasis added).

[88] The Senate's replacement, Section 1021, states that "the authority of the President to use all necessary and appropriate force pursuant to the [2001 AUMF] includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war." The "covered persons" include "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States." See 157 Cong. Rec. S8235 (daily ed. Dec. 5, 2011).

[89] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155-56 (2000); *Flood v. Kuhn*, 407 U.S. 258, 283 (1972).

suspected terrorists."[90] He did not complain about the NDAA's refusal to expand his war-making powers under the 2001 AUMF.

All this changed on September 23, 2014, when the President sent his letter to Congress asserting that the 2001 AUMF would now serve as authority to initiate hostilities against ISIL. Nevertheless, the District Court relied on Preston's claims without confronting the fact that, both in 2001 and 2012, Congress had explicitly *restricted* the President's war-making authority to "organizations" that had existed at the time of the September 11 attacks. The court's uncritical reliance on Preston's assertions fails to satisfy the "scrutiny" demanded by *Youngstown*. It should be reversed.

### D. The District Court Erred in Giving Authoritative Status to Stephen Preston's Speech Justifying the War

In its argument below, the government identified Stephen Preston's speech as though it is an authoritative statement of the Obama Administration's position. Undoubtedly, this is why the District Court relied on it so heavily.

The speech is not entitled to this status. In contrast to National Security Adviser Rice's letter, Mr. Preston's talk was not directed to Congress. It was delivered to the American Society of International Law at its annual meeting on April 10, 2015. Moreover, the content and context of the speech demonstrates that it was *not* presented as an official position of the Administration.

[90] Statement of the President on H.R. 1540 (Dec. 31, 2011).

For starters, the speech makes no claim to official status. Preston expressed gratitude "to my colleagues in government, who have contributed to my remarks," but he did not say they endorsed them.[91] Moreover, when Preston went before the Senate Foreign Relations Committee the year before, he did not claim any such authoritative status. Instead, he was one of two representatives of the Obama Administration, who appeared on a panel with two other distinguished lawyers who had previously served President Obama or President Bush.[92] When he was

---

[91] See Preston, *supra* note 85.

[92] The other witnesses were Mary McLeod from the State Department's Legal Adviser's Office, Harold Koh, who had previously served as the Department's Legal Adviser, and Michael Mukasey, formerly Attorney General under President Bush. Mr. Mukasey was the last of the four to testify, and specifically remarked on the legal "somersaults" exhibited by the previous witnesses. *Id*. at 459, 52-53. Throughout the hearing, both Democratic and Republican Senators expressed similar impatience at the obscurities generated by the witness' testimony. See *id*. at 18 (Sen. Corker); *id*. at 24 (Sen. Rubio); *id*. at 20 (Sen. Kaine); *id*. at 27 (Sen. Johnson); *id*. at 34 (Sen. Murphy. Chairman Robert Menendez summed up these concerns:

> [U]nder the War Powers Act, … there would be an action by the President, but, within a certain time period, there would have to be a response from the Congress…[W]hile I believe in Security Council resolutions to create international support …, I am still concerned that, when we want to participate under such an umbrella, that there must be an authorization of the Congress to do so if it is not an imminent-threat situation.
>
> So, I would like you to all go rethink that and come back …to define for us what your view is. It may not be my view, but I would like to hear what your view is.

*Id*. at 34-35.

explicitly asked whether the President had authority to initiate hostilities against ISIL, he refused to commit himself.[93]

Moreover, there is a special statute, 28 U.S.C. §513, which raises a special problem for Defense Department lawyers claiming to serve as Administration spokesmen. This provision requires the DOD to send "all questions of law arising in the administration [of its affairs] . . . to the Attorney General for disposition," except where otherwise provided by statute.[94] No similar demand is imposed on any other department. This exceptional treatment reflects the pervasive commitment to civilian control over the military that has characterized American arrangements since the Founding.

In taking to the podium at the American Society of International Law, Preston was not challenging these principles. Like other Administration lawyers in

---

[93] See *Authorization for Use of Military Force After Iraq and Afghanistan: Hearing Before the S. Comm. on Foreign Relations*, 113th Cong. 459, at 17 (2014) (colloquy with Senator Corker).

[94] *See* 28 U.S.C. §513:

> When a question of law arises in the administration of the Department of the Army, the Department of the Navy, or the Department of the Air Force, the cognizance of which is not given by statute to some other officer from whom the Secretary of the military department concerned may require advice, the Secretary of the military department shall send it to the Attorney General for disposition.

See generally, 28 U.S.C. §§511-513.

Trevor Morrison, Dean of NYU Law School, who served as Associate White House Counsel to President Obama, notes the exceptional character of the treatment of the Defense Department at *Constitutional Alarmism*, 124 Harv. L. Rev. 1688, 1710 & n.82 (2011).

the past, he was engaged in an educational mission—keeping the legal community abreast of contemporary developments. As he explained, he was using his speech to "update" his audience on "the legal authority for U.S. military operations as the mission has evolved over the past year or so." But this "update" did not confront, let alone resolve, the hard legal questions raised by the text and history of the two AUMFs—this would have made the speech much too long and tedious.

Mr. Preston's speech is only one of many informal efforts by government spokesmen to provide rationalizations for the President's September 23rd letter to Congress. We analyzed the conflicting statements from the Obama Administration in our presentation to the District Court. This cacophony is the product of an institutional failure of major importance. During the three remaining years of the Obama Administration's escalating warfare against ISIL, the OLC failed to publish a serious opinion explaining why the 2001 and 2002 Iraq AUMFs, authorized the President's decision to take an end-run around Congress in 2014.

The OLC's silence is especially revealing when viewed in the context of the Administration's previous encounter with the WPR in 2011. This was the moment when President Obama unilaterally ordered military operations against the Khaddafi regime in Libya. As in the present case, the President did not believe that the WPR required him to gain congressional approval, and asked the opinion of the OLC whether he was correct. After studying the matter, the OLC prepared an

opinion which determined that the President's views were incorrect, and that he was indeed obliged to gain the "specific" congressional authorization required by the WPR.[95]

In response, the President refused to allow the OLC to publish its opinion and turned instead to his White House Counsel, who approved a more supportive opinion prepared by the Legal Advisor of the State Department, which was published just before the ninety-day deadline.[96]

This opinion predictably proved controversial. But it served a crucial constitutional function: it assured Congress, and the broader public, that the Administration was making a serious effort to comply with its responsibility to "take care that the laws be faithfully executed." In contrast, the silence of these legal watchdogs in this case speaks louder than words. It requires the judiciary to take its *Youngstown* responsibilities even more seriously. Rather than treating an unofficial speech before a scholarly society as authoritative, *Youngstown* requires an extraordinary level of "scrutiny" when the Office of Legal Counsel has failed to

---

[95] WPR §5(b)

[96] See Trevor Morrison, *Libya, "Hostilities," the Office of Legal Counsel, and the Process of Executive Branch Legal Interpretation*, 124 Harv. L. Rev. F. 62, 65 (2011).

publish a legal opinion that presents a systematic analysis of the text and history of the AUMFs that the President invoked to justify his end-run around Congress.[97]

### E. Congressional Funding of OIR Does Not Constitute the "Specific" Authorization Required by the WPR.

Section 8(a)(1) of the WPR provides that congressional approval shall not "be inferred from any provision . . . contained in any appropriations Act, unless such provision specifically authorizes the introduction of United States Armed Forces into hostilities." This section played a key role in stabilizing the entire statutory framework.

As Senator Eagleton, a co-sponsor of the Act, explained:

> We have also categorically stated that appropriations measures cannot simply imply congressional authorization to conduct war. If this principle were accepted, the President could theoretically wage war with impunity while confidently challenging each House to attempt to

---

[97] This Court has recently emphasized the role of the OLC as principal guardian of legality in the executive branch. *See Citizens for Responsibility & Ethics in Wash. v. United States*, 846 F.3d 1235, 1238 (D.C. Cir. 2017):

> For decades, [the Office of Legal Counsel (OLC) ] has been the most significant centralized source of legal advice within the Executive Branch. Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1451 (2010). Indeed, executive-branch officials seek OLC's opinion on some of the weightiest matters in our public life: from the president's authority to direct the use of military force without congressional approval, to the standards governing military interrogation of "alien unlawful combatants," to the president's power to institute a blockade of Cuba. Office of Legal Counsel . . . .

> muster a two-thirds majority to stop him. Such a situation is not only extremely dangerous but, in effect, it turns our carefully devised system of checks and balances on its head.[98]

The Senate Committee on Foreign Relations also emphasized that Section 8(a)(1) played a key role in "avoid[ing] any ambiguities such as possible efforts to construe general appropriations or other such measures as constituting the necessary authorization for 'continued use.'"[99]

The Committee's concern about misinterpreting "general appropriations . . . measures" is dramatized by the present case. The NDAAs for each of the fiscal years of 2014, 2015, and 2016 appropriated about $70 billion to the Departments of Defense and State for an extraordinary variety of programs—ranging from Migration and Refugee Assistance to the Afghan Security Forces Fund. Yet the NDAA for 2014 dedicated less than one billion to support the War. During each of the next two years, War-related expenditures accounted for less than four percent of the total omnibus amount.[100]

Within this context, the WPR's "clear statement" rule makes simple common sense. Once the House and Senate reconcile their versions of an omnibus

---

[98] *War Powers Legislation, 1973: Hearings on S. 440 Before the S. Comm. on Foreign Relations*, 93d Cong. 115 (1973) (statement of Sen. Eagleton).

[99] S. Rep. No. 93-220, at 29 (1973).

[100] *See* Appendix A to Plaintiff's Memorandum in Opposition to Motion to Dismiss: ISIS-Related Share of Omnibus Appropriations Acts provides the supporting analysis of the data and analysis which supports this conclusion.

appropriations bill, members cast a single "Yes" or "No" vote on the entire package. For a House or Senate vote to count as a "specific" authorization under the WPR, Members should be focused on the critical issue of war and peace. But they cannot be when members cast a single vote on an omnibus appropriation devoted overwhelmingly to other projects. Expressing this fact, Congress's rules prohibit the use of appropriations as vehicles for substantive legislation.[101] The Supreme Court has also emphasized that legislators voting on appropriations "are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden." As a consequence, the canon cautioning judges against implicit repeal of pre-existing legislation "applies with full vigor when . . . the subsequent legislation is an appropriations measure."[102]

The WPR's "clear statement rule" in Section 8(a)(3) has obvious merit, but it also carries a distinctive legal status. When courts create their own "clear statement" rules, judges remain free to adapt and revise them when it seems appropriate. But judges have no similar freedom when Congress imposes these rules by express command.

---

[101] *See* House Rule XXI.2, §2(b), (c), 114th Cong. (2015); Standing Rules of the Senate XVI.4, 113th Cong. (2014).

[102] *See, Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1977). For a recent application, see *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017).

Nevertheless, the District Court chose to ignore the WPR's statutory dictate, and held that Congress's repeated decisions to fund the War demonstrated that the political branches did not really disagree on the merits of OIR. This conclusion served as the basis of the court's third and final rationale for invoking the "political question" doctrine. In its view, Section 8(a)(1)'s "clear statement" rule was only relevant if it had reached the merits of Smith's complaint, but the District Court simultaneously concluded it remained free to consider appropriations in determining whether the lawsuit was justiciable in the first place.[103]

This conclusion, however, can be no better than its premises. As we have seen, Section 8(a)(1) serves as a fundamental element in implementing the WPR's effort to eliminate the "political question" issue by shifting Presidential war-making from *Youngstown* Category Two to *Youngstown* Category Three. It is only by failing to recognize the central role that Justice Jackson's concurring opinion played in guiding the formulation of the WPR that the District Court could suppose that it could ignore the command of 8(a)(1) and insist that Congress was indeed supporting the President's war against ISIL by its funding decisions.

But let us suppose, for purposes of the argument, that the District Court's dismissal of the WPR's "clear statement" rule had a substantial legal foundation. Nevertheless, its conclusion would not follow—because it has misread the

---

[103] App. 91-93.

applicable legislation. In each of the NDAAs for 2014, 2015, and 2016, Congress added provisions which *explicitly* stated that its appropriation *should not be construed* as amounting to the "specific" authorizations required by the WPR. The District Court did not address this issue, so we repeat the critical points here.

Congressional consideration of the WPR began the very first time it decided to fund the War. On September 19th, Congress amended the Continuing Appropriations Resolution of 2015 ("2015 CR") to allow the transfer of already appropriated funds for the new campaign. In approving this transfer, the amendment stipulated that "[n]othing in this section shall be construed to constitute a specific statutory authorization for the introduction of United States Armed Forces into hostilities or into situations wherein hostilities are clearly indicated by the circumstances."[104] As Representative Howard McKeon, the primary sponsor of the amendment, explained: "There may be a time when we need to have an AUMF debate, but this is not it. The President has not asked for such an authority."[105]

Call this an explicit disclaimer, since the provision is specifically directed at the War. In addition, the 2015 CR contained a general disclaimer: "[n]one of the

---

[104] Continuing Appropriations Resolution, 2015, §149(i), Pub. L. No. 113-164, 128 Stat. 1867, 1876 (2014).

[105] 160 Cong. Rec. H7557 (daily ed. Sept. 16, 2014) (statement of Representative McKeon).

funds made available by this Act may be used in contravention of the War Powers Resolution."[106]

Congress's stop-gap funding measure was replaced on December 16th by a new appropriations act for the rest of the fiscal year. This was passed after the WPR's mandatory 60/90 day deadline, and continued the "double disclaimer" strategy. It contained a specific provision declaring that funding for the Syrian campaign did not represent the "specific authorization" required by the WPR,[107] and a general ban on the use of funds "in contravention of the [WPR]."[108]

The same disclaimer appears in the Consolidated Appropriations Act for 2016.[109] This time around, it is joined by two specific disclaimers—one denying "specific authorization" for the campaign against ISIL in Iraq; the other, denying it for hostilities in Syria.[110]

The District Court ignored all these provisions. It relied instead on the following excerpt from the Explanatory Statement accompanying the 2015 Act:

---

[106] See Consolidated Appropriations Act, 2014, §9015, Pub. L. No. 113-76, 128 Stat. 5, 150 (2014).

[107] See Consolidated and Continuing Appropriations Act, 2015, §9014, Pub. L. No. 113-235, 128 Stat. 2130, 2300 (2014) ("None of the funds made available by this Act may be used with respect to Syria in contravention of the War Powers Resolution (50 U.S.C. 1541 *et seq*.), including for the introduction of United States armed or military forces into hostilities in Syria, into situations in Syria where imminent involvement in hostilities is clearly indicated.").

[108] *Id.* §8116.

[109] §8106, Pub. L. No. 114-113, 129 Stat. 2242, 2376.

[110] §8122, 129 Stat. at 2380 (Iraq); §9012, 129 Stat. at 2397 (Syria).

> The Explanatory Statement for the 2016 Appropriations Act that appropriated these funds stated that "the rise of the Islamic State of Iraq and the Levant (ISIL)" serves as a reminder that "it is more important than ever to provide the funding and resources necessary to ensure that the military and Intelligence Community are able to detect and disrupt developing threats."

It also stated that the Act "moves funding . . . to provide additional funding for the Army, Navy, Marine Corps, and Air Force to conduct counter-ISIL operations."[111]

But the District Court's description of the Explanatory Statement is fatally incomplete. It fails to note that the Statement also reports that "the omnibus bill retains a provision proposed by the House which prohibits funds from being used to violate the War Powers Resolution."[112] Even on its own terms, then, the District Court's reasoning falls of its own weight.[113] The Explanatory Statement does not

---

[111] App. 91-92.

[112] See Consolidated Appropriations Act, 2016 Committee Print of the H. Comm. on Appropriations, Explanatory Statement, 563, Pub. L. No. 114-113, 129 Stat. 2242 (2015).

[113] The Summary makes the essential point by citing the Act's general disclaimers. But as we have seen, the omnibus measure contains two additional disclaimers specifically directed to Iraq and Syria, reemphasizing Congress' refusal to authorize the war under the WPR. But comprehensiveness should not be expected of a Summary. It is enough that it makes the essential point. Under the omnibus appropriation statute, the Summary has "the same effect … as if it were a joint explanatory statement of a committee of conference." See *id*., § 4. While conference committee reports are useful aids in resolving statutory ambiguities, they never trump the plain language of statutory provisions.

claim that the act satisfies the WPR's demand for "explicit authorization"; it says just the opposite.[114]

In rejecting this finding as legally unfounded, this Court should also reject the mistaken methodology which generated it. It should make it clear that it is the language of the statute itself, not the summary provided by the Explanatory Statement, that serves as the authoritative meaning for the NDAAs. It should also make it clear that, even if the NDAAs had been completely silent, Congressional funding should not, under the WPR, "be inferred from any provision . . . contained in any appropriation Act, unless such provision specifically authorizes the introduction of United States Armed Forces into hostilities."[115]

Only one issue remains. At one point, the District Court asserted that an earlier Congress cannot force later Congresses to abide by its rules of statutory interpretation.[116] But this objection, if accepted, would render unconstitutional all

---

[114] The District Court also notes that the government "cites the National Defense Authorization Acts for Fiscal Years 2015 and 2016, each of which addresses to some extent the threat posed by ISIL." But it fails to recognize that the 2015 NDAA also contained a specific disclaimer that it should not "be construed to constitute a specific statutory authorization for the introduction of United States Armed Forces into hostilities." *Id.* at §1209 (h),(i), Pub. L. No. 113-291, 128 Stat. 3292, 3543 (2014). In any event, these authorization statutes would only become decisive if the omnibus appropriations had been silent on the matter. But as we have shown, they consistently contained explicit disclaimers themselves, allowing us to leave the prior authorizing legislation in the interpretive background.

[115] WPR §8(a)(1).

[116] App. 92-93, at n.15; Government's Opposition Brief at 29 n.47.

of the rules of interpretation that Congress has imposed on courts since the Founding. The U.S. Code contains literally thousands of them. If Congress is no longer satisfied with one or another of these rules of interpretation, it is always free to repeal them. But so long as they remain on the statute books, courts have no power to revise these legislative judgments. Since Section 8(a)(1) is well within the authority granted Congress to enact legislation it deems "necessary and proper" to implement its authority "to declare war," courts have a constitutional obligation to respect the Rule's requirements.

## CONCLUSION

For the foregoing reasons, the decision of the District Court should be reversed.

Respectfully submitted,

/s/ David H. Remes
David H. Remes
Appeal for Justice
1106 Noyes Drive
Silver Spring, MD 20910
202-669-65098
remesdh@gmail.com

Bruce Ackerman, Sterling Professor of Law and Political Science at Yale University, significantly contributed to the arguments presented in this brief.

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it brief contains 12,844 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: April 3, 2017

/s/ David H. Remes
David H. Remes
Counsel for Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of April, 2017, I filed and served the foregoing Brief of Appellant and Joint Appendix through this Court's ECF system.

/s/ David H. Remes
DAVID H. REMES